UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | 1:12-CR-34 |
| v. ) | |
| ) | Judge Curtis L. Collier |
| ROBBIE TAYLOR BELL ) | |

## **MEMORANDUM**

Defendant Robbie Taylor Bell ("Defendant") filed a motion to suppress evidence and his statement in this case (Court File No. 28). The motion was referred to United States Magistrate Judge William Carter, who held a hearing and subsequently filed a Report and Recommendation ("R&R") concluding Defendant's motion should be denied (Court File No. 34). Defendant timely objected (Court File No. 35). The government did not respond to Defendant's objection. For the following reasons, the Court will **ACCEPT** and **ADOPT** the R&R (Court File No. 34). Accordingly, Defendant's motion to suppress will be **DENIED** (Court File No. 28).

### I.      RELEVANT FACTS

The following recitation of facts is derived primarily from the magistrate judge's R&R. On October 19, 2011, at about 1:00 am, Chattanooga Housing Authority ("CHA") Officers Ian Galyon and James Avery responded to a number of complaints regarding Kenyasha Leverett's apartment in the College Hill Courts housing project. The complaints referred to Ms. Leverett's boyfriend, Defendant, who was on CHA's "no trespassing list." Defendant was on this list because he is both a known gang member and has a prior felony conviction. Persons on the list are prohibited from entering CHA properties. Defendant was on this list on the date in question and had previously been cited for trespassing on CHA property.

When Officer Galyon arrived at the apartment, Defendant and the husband of Defendant's

niece were inside.[1] Upon Officer Galyon's request, both individuals exited the apartment for a discussion. Because Officer Galyon knew Defendant to be a gang member, was by himself, and was in high gang activity area in the middle of the night, he handcuffed Defendant for his own safety. He had not decided at this point whether he would formally arrest Defendant or whether he would simply cite him for trespassing. Officer Galyon was then joined by six officers of the Chattanooga Police Department.[2]

Officer Galyon was wearing a small camera with audio on his shirt lapel. At the hearing, the video was played. The video depicts Defendant and his niece's husband being questioned by police in a calm, polite manner. They discussed Defendant's presence on the no trespassing list and that CHA received complaints about his trespassing on CHA property. He denied staying at the apartment with Leverett, and stated he was staying in a motel on Broad Street with his sister. He did admit his daughter lived with Leverett, and he was paying the cable bill for the apartment. He also conceded being a member of a gang.

While this was happening, Officer Avery went to the back of the apartment and saw Leverett in the doorway. Officer Avery asked to speak with her. After he entered the apartment, the circumstances of which were disputed at the suppression hearing, Officer Avery and Leverett discussed the no trespassing list and the complaints CHA received. After the conversation ended, Officer Avery noticed boxes of ammunition on the kitchen counter. When he asked Leverett who the ammunition belonged to, she stated "They are Robert's," apparently referring to Defendant.

---

[1] From the video played at the suppression hearing, others were also likely in the residence. It is also unclear whether the second individual was the husband of Defendant's niece or his great niece.

[2] Whether Officer Galyon was ever alone at Leverett's residence is disputed by Defendant.

2

Leverett denied making this statement at the suppression hearing, and claimed instead the ammunition belonged to a homeless man she fed in exchange for performing some chores.

Officer Avery then went to where Officer Galyon was speaking with Defendant. Officer Avery advised Defendant of his *Miranda* rights and confirmed Defendant's understanding of those rights. Officer Avery asked Defendant if he would talk to him, and Defendant agreed. Officer Avery then told Defendant his chief wanted him to arrest Defendant for trespassing, and asked him if he was a convicted felon. Defendant confirmed he had previously been convicted of a felony. Officer Avery and Defendant also discussed Defendant's gang affiliation. Officer Avery then showed Defendant the boxes of ammunition and asked him about them. Defendant admitted they were his, claiming a friend gave them to him and he planned to sell the ammunition for $5 per box. Defendant was then arrested for trespassing.

Defendant filed the instant motion to suppress on two grounds: (1) the ammunition should be suppressed because Officer Avery violated the Fourth Amendment when he entered Leverett's apartment without a warrant or consent; and (2) Defendant's statement to Officer Avery should be suppressed because his Fifth Amendment right against self incrimination was violated. The motion was referred to Magistrate Judge William Carter, who held a hearing on the motion. The Magistrate Judge then filed a R&R recommending the motion be denied. The Magistrate Judge concluded Defendant lacks standing to raise the Fourth Amendment argument because he did not have a legitimate expectation of privacy in Leverett's apartment. Although the extent to which Defendant was living at the apartment was disputed during the suppression hearing, the Magistrate Judge concluded Defendant lacked a legitimate expectation of privacy because he was a trespasser on CHA property. With respect to the second issue, the government clarified at the hearing it only intended

to introduce Defendant's statements made after Officer Avery informed Defendant of his *Miranda* rights. Defendant nevertheless argued he was coerced into making the relevant statements. The Magistrate Judge considered the recorded interaction and concluded there was no coercive conduct.

After the Magistrate Judge filed his report and recommendation, Defendant filed six objections. Defendant objects to the Magistrate Judge's representation Defendant stated he was not an overnight guest at Leverett's apartment during his questioning, and notes he merely stated he was not "staying" there. Defendant objects to the Magistrate Judge's conclusion Defendant did not have a legitimate expectation of privacy in Leverett's apartment. Defendant notes both Officer Avery and Officer Galyon testified they had received paperwork indicating they were to arrest Defendant if he was caught trespassing again. Defendant objects to the Magistrate Judge's representation Officer Galyon was ever the only officer on the scene, that he cuffed Defendant and his niece's husband, and notes there were between six and nine officers on the scene. Defendant objects to the portion of the R&R that suggests Leverett gave Officer Avery permission to enter her home. Defendant objects to the Magistrate Judge's conclusion the post-*Miranda* statements are admissible because the circumstances of Defendant's pre-*Miranda* questioning and confinement render the interrogation coercive.

## II. STANDARD OF REVIEW

This Court must conduct a *de novo* review of those portions of the R&R to which objection is made. 28 U.S.C. § 636(b)(1)(C). But *de novo* review does not require the district court rehear witnesses whose testimony has been evaluated by the Magistrate Judge. *See United States v. Raddatz*, 447 U.S. 667, 675-76 (1980). The Magistrate Judge, as the factfinder, had the opportunity to observe and hear the witnesses and assess their demeanor, putting him in the best position to

4

determine credibility. *Moss v. Hofbauer*, 286 F.3d 851, 868 (6th Cir. 2002); *United States v. Hill*, 195 F.3d 258, 264-65 (6th Cir. 1999). The Magistrate Judge's assessment of witnesses' testimony is therefore entitled to deference. *United States v. Irorere*, 69 F. App'x 231, 236 (6th Cir. 2003).

## III. DISCUSSION

Defendant's objections raise two primary arguments: (1) the ammunition uncovered from Leverett's apartment should be suppressed because the seizure violated Defendant's Fourth Amendment rights; and (2) Defendant's post-*Miranda* statements should be suppressed because his pre-*Miranda* statements were obtained in violation of the Fifth Amendment.

### A. Ammunition

"'The Fourth Amendment protects people, not places,' and provides sanctuary for citizens wherever they have a legitimate expectation of privacy." *Minnesota v. Olson*, 495 U.S. 91, 96 n.5 (1990) (quoting *Katz v. United States*, 389 U.S. 347, 351, 359 (1967)) (internal citation omitted). "A defendant must satisfy a two-pronged test to show a legitimate expectation of privacy: 1) he must manifest an actual, subjective expectation of privacy; and 2) that expectation is one that society is prepared to recognize as legitimate." *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000). Defendant seeks suppression of the ammunition on the ground Officer Avery entered Leverett's apartment without permission and in violation of the Fourth Amendment. The Magistrate Judge concluded Defendant had no reasonable expectation of privacy in Leverett's apartment because he was trespassing on CHA property.

Defendant appears to challenge the Magistrate Judge's conclusion on the grounds Defendant was an overnight guest of Leverett's, and therefore had a legitimate expectation of privacy in her apartment. Defendant is correct that such guests are typically provided Fourth Amendment

protection. *See United States v. Washington*, 573 F.3d 279, 283 (6th Cir. 2009) ("The Sixth Circuit has generously construed the Fourth Amendment as protecting nearly all overnight guests, even when the guest occupies a common area in the apartment that is not private from other residents."). However, as the Magistrate Judge concluded, whether Defendant was or was not an overnight guest[3] is immaterial: Defendant was undisputedly trespassing on CHA property. "By definition, trespassers cannot have an objectively reasonable expectation of privacy in the property on which they are trespassing." *Id.* at 284 (citing *United States v. McRae*, 156 F.3d 708, 711 (6th Cir. 1998)); *see also United States v. Hunyady*, 409 F.3d 297 (6th Cir. 2005) (holding defendant had no expectation of privacy where the landlord changed the locks and provided him formal notice to vacate); *United States v. Ross*, 43 F. App'x 751 (6th Cir. 2002) (holding defendant had no legitimate expectation of privacy in an apartment after his lease expired and he was required by its terms to vacate the premises); *United States v. McRae*, 156 F.3d 708 (6th Cir. 1998) (holding defendant has no legitimate expectation of privacy in a vacant house in which he was is squatting); *United States v. Allen*, 106 F.3d 695 (6th Cir. 1997) (holding defendant had no expectation of privacy in a hotel room after the motel manager locked him out of the room and took possession of the room).

The Sixth Circuit's decision in *Washington*, although concluding a defendant did have a legitimate expectation of privacy in another's apartment, is instructive nevertheless. In *Washington*, a tenant in an apartment building was arrested on drug paraphernalia charges after he dropped a

---

[3] As the Magistrate Judge noted, Defendant adamantly denied being such a guest during his initial pre-*Miranda* questioning. Defendant objects to this representation stating Defendant never denied being an overnight guest, but merely stated he was not "staying" at Leverett's apartment but was instead "staying" at a nearby motel. It is unclear what Defendant could have meant by "staying" other than "staying overnight." Regardless, because Defendant was otherwise trespassing, the Court need not decide this issue.

6

cocaine base smoking device in the hallway of the building. Subsequently, the landlord informed officers that non-residents frequently loitered in the hallways of the building, and requested they patrol the building and remove non-residents and trespassers. He also informed the officers the individual they arrested had a significant amount of foot traffic in and out of his apartment, and due to his arrest, no one was permitted in his unit. A few days later, officers noticed individuals were in the tenant's apartment, and entered the apartment on the theory those occupants were not permitted to be in the unit. Upon their entry, officers discovered multiple individuals, including the defendant. Officers then searched the defendant, over his objection, and uncovered a firearm and drug paraphernalia on his person. After being charged as a felon in possession of a firearm, the defendant moved to suppress this evidence, arguing the warrantless search violated his Fourth Amendment rights.

The Sixth Circuit concluded the defendant had a legitimate expectation of privacy in the apartment. After noting overnight guests retain legitimate expectations of privacy in the residences of third persons, the court considered the government's arguments. The government argued, because the defendant had been previously arrested for trespassing in another unit, he had no expectation as to the unit in question. The court rejected this argument out of hand, because "[a] person who trespasses in one apartment may legitimately live in another; he is not thereby cast out of that habitation." *Washington*, 573 F.3d at 283. The government also argued, as the government argues in this case, the defendant was a trespasser and so had not expectation of privacy in the apartment. The court in *Washington* rejected this argument, concluding the previously arrested tenant had a legitimate interest in the apartment and could confer overnight guest status onto the defendant. Although the tenant's lease prohibited multiple occupants, the landlord had not evicted

7

the tenant, and this failure effectively waived the landlord's ability to treat an occupant as a trespasser. *Id.* at 284 (citing 49 Am. Jur. 2D *Landlord and Tenant* § 260 (2009) ("As general rule, any act of the landlord that affirms the existence of the lease and recognizes the tenant as lessee, after the landlord has knowledge of a breach of the lease which would constitute a cause to terminate the lease, results in a waiver by the landlord of the right to declare a forfeiture of the lease.")). Because these arguments, and others not relevant here,[4] failed, the court concluded the defendant had a legitimate expectation of privacy in the tenant's residence as an overnight guest.

Here, on the other hand, Defendant had been previously cited for trespassing *in this very unit* and was on notice he held the status of a trespasser. This fact alone distinguishes this case from *Washington*. Moreover, in *Washington* the government argued the defendant was a trespasser based on the provisions of the tenant's lease. The Sixth Circuit rejected this argument based on basic landlord-tenant law. In other words, the government argued the tenant lacked the ability to confer overnight guest status on the defendant because that power was precluded by the terms of the lease, which prohibited multiple occupants. The landlord's acquiescence to this violation, however, rendered that portion of the lease inapplicable. Here, on the other hand, Defendant was considered a trespasser not on the basis of any provision in Leverett's lease, but on the basis of a separate list produced by CHA of which both Leverett and Defendant had notice, and pursuant to which Defendant had already been cited at least once prior to the incident in question. Accordingly, unlike *Washington*, Defendant was a trespasser by express action of the landlord, CHA, rather than by

---

[4] The government in *Washington* argued the defendant's use of the apartment for illegal activities precluded a finding he had a legitimate expectation of privacy. The government made a similar argument due to a provision of the tenant's lease that prohibited illegal activity from occurring on the premises. The court rejected both of these arguments.

8

logical consequence of a provision of Leverett's lease. Because Defendant was trespassing on CHA's property, Leverett's possible overnight invitation is immaterial to the Court's Fourth Amendment analysis.

At least one other court has reached a similar conclusion on very similar facts. In *State v. Oien*, 717 N.W.2d 593 (N.D. 2006), the North Dakota Supreme Court held a housing authority's notice to a defendant he was not permitted on the property and was considered a trespasser prevented him from obtaining any expectation of privacy in his girlfriend's apartment. In *Oien*, the defendant was involved in a domestic dispute with his girlfriend at her apartment, and as a result, the housing authority sent the local police department a "no trespass" order and informed the tenant-girlfriend, through both written and verbal notice, that the defendant was not allowed at her apartment. Written notice was also sent to the defendant. After being discovered at her apartment again, the defendant was arrested and found in possession of marijuana. The defendant moved to suppress the evidence on the grounds the entry and search of his girlfriend's apartment violated his Fourth Amendment rights. The trial court denied the motion and the supreme court affirmed. Because the defendant knew he was not allowed on the property and knew he was trespassing, he did not have a reasonable expectation of privacy. Accordingly, his Fourth Amendment rights were not violated.

The Court finds a similar conclusion must be drawn here. Defendant was not only notified he was prohibited from being on CHA property, he was previously cited for violating that restriction. Given his knowledge he was not allowed on CHA property and may suffer such consequences for visiting Leverett's apartment, the Court concludes Defendant had no legitimate expectation of privacy in her apartment. Accordingly, regardless of whether he was staying overnight at Leverett's

9

apartment, his Fourth Amendment rights were not violated on the night in question. The Court will therefore **DENY** Defendant's motion to suppress the ammunition in this case.

### B. Statements

Defendant objects to the Magistrate Judge's conclusion his statement to law enforcement admitting ownership of the ammunition should be admitted. Defendant argues the prior twenty-five minutes of questioning without *Miranda* warnings rendered the post-*Miranda* statement inadmissible.

The Fifth Amendment protects a person from being compelled to incriminate him or herself. *See, e.g.*, *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). A suspect who is in custody and subject to interrogation must be given *Miranda* warnings against self incrimination. *Miranda*, 384 U.S. at 467-68. Because of the pressures and psychological stress exerted on those in custody, officers of the law are required to adequately and effectively apprise such individuals of their rights and must fully honor their decision should they seek counsel before answering questions. *Id.* at 467. If an individual agrees to answer questions without counsel, the officer can then question the individual freely. *Davis v. United States*, 512 U.S. 452, 458 (1994). The government bears the burden of establishing a waiver by the preponderance of the evidence. *United States. v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009) (citing *United States v. Nichols*, 512 F.3d 789, 798 (6th Cir. 2008)). A "waiver of *Miranda* rights must be voluntary, that is, 'the product of a free and deliberate choice rather than intimidation, coercion or deception.'" *Id.* Such a waiver must also be "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Daoud v. Davis*, 618 F.3d 525, 529 (6th Cir. 2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

10

Here, Defendant objects to the adequacy of the so-called "*Miranda*-in-the-middle" interrogation. Occasionally, law enforcement will conduct a custodial interrogation of a suspect without advising him of his *Miranda* rights. After the suspect has effectively confessed to the crime, law enforcement will then read him those rights and seek admittance of the subsequent confession. The Supreme Court has recognized this procedure as an end-run around the *Miranda* requirement, and has observed the subsequent statement may be so tainted by the prior *Miranda* violation that both pre- and post-*Miranda* statements must be suppressed.

In *Missouri v. Seibert*, 542 U.S. 600 (2004), the Court excluded such a statement. The defendant in *Seibert* was the mother of a twelve-year-old child who suffered from cerebral palsy. After he died in his sleep, the mother attempted to conceal his death by burning the family home with the body inside. She arranged for a local, mentally ill teenager to stay in the home to ensure the scene did not suggest the twelve-year old was home alone. The teenager died in the fire, and police questioned the defendant at the hospital five days later. The interrogating officer was specifically instructed not to give her *Miranda* warnings during his initial questioning. However, after thirty minutes of questions that focused on the teenager's death, the defendant admitted to her actions. Officers then provided the defendant a twenty-minute break, after which she was *Mirandized* and asked the same questions. During this second interrogation, she confessed.

Five justices concluded the statement should be suppressed. A plurality of four concluded "[t]he threshold issue when interrogators question first and warn later is [] whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Seibert*, 542 U.S. at 611-12. The Court explained,

> unless the warnings could place a suspect who has just been interrogated in a
> position to make [] an informed choice [about whether to give an admissible

11

> statement], there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.

*Id.* at 612. The plurality identified five factors courts should consider in determining the admissibility of the post-*Miranda* statements:

> (1) the completeness and detail involved in the first round of questioning; (2) the overlapping content of the statements made before and after the warning; (3) the timing and setting of the interrogation; (4) the continuity of police personnel during the interrogations; and (5) the degree to which the interrogator's questions treated the second round as continuous with the first.

*United States v. Pacheco-Lopez*, 531 F.3d 420, 427 (6th Cir. 2008) (citing *Seibert*, 542 U.S. at 615).

Justice Kennedy submitted a concurring opinion, in which he rejected this test and instead focused on whether a *Miranda*-in-the-middle interrogation is "used in a calculated way to undermine the *Miranda* warning." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring). Under the Kennedy test, only intentional uses of this technique would lead to suppression of the post-*Miranda* statement. Otherwise, a court should focus on the voluntariness of the pre- and post-*Miranda* statements to determine their admissibility. This voluntariness inquiry was based on the Supreme Court's decision in *Oregon v. Elstad*, 470 U.S. 298, 308 (1984), which concluded a *Miranda*-in-the-middle statement was admissible because suppression would serve "neither the general goal of deterring improper police conduct nor the Fifth Amendment goal of assuring trustworthy evidence . . . ." Under *Elstad*, when the "first statement is shown to have been involuntary, the court must examine whether the taint dissipated through the passing of time or a change in circumstances." *Seibert*, 542 U.S. at 628 (Kennedy, J., concurring) (citing *Elstad*, 470 U.S. at 310). This voluntariness inquiry is not based purely on failure to provide *Miranda* warnings, but is based on actual coercion. Where no coercion occurred to obtain an unwarned statement, "a careful and thorough administration of *Miranda*

12

warnings serves to cure the condition that warranted the unwarned statement inadmissible. The warning conveys the relevant information and thereafter the suspects' choice whether to exercise his privilege to remain silent should ordinarily be viewed as an 'act of free will.'" *Elstad*, 470 U.S. at 310-11 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)). However, when a prior statement was actually coerced, courts should consider "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators" when determining whether the second statement is so tainted by that coercion as to be inadmissible. *Id.* at 310.

Many courts have had difficulty determining which of these tests is now controlling. *See Pacheco-Lopez*, 531 F.3d at 427 n.11 (not deciding the issue but noting most courts have concluded Justice Kennedy's opinion is controlling but others have "raised doubts about whether his concurrence actually represents the narrowest grounds for decision"). The Court need not struggle with this issue because Defendant's post-*Miranda* statement is admissible under either test. Because the government does not seek to admit the pre-*Miranda* statement, the Magistrate Judge did not consider its admissibility. The Court will similarly assume its inadmissibility for the purposes of this motion.

The controlling factor in this case under both tests is the complete disconnect between the two statements. The first statement, a long discussion between Officer Galyon and Defendant, focused entirely on Defendant's trespasser status and his presence in Leverett's apartment.[5] The ammunition was not discussed, and it could not have been discussed, because Officer Galyon was

---

[5] In fact, for much of the pre-*Miranda* period, Defendant stood or sat silently while officers attempted to identify his companion.

13

unaware any ammunition was in the residence. After Officer Avery discovered the ammunition, he came outside and separated Defendant from the other individuals, other than Officer Galyon. He then read Defendant his *Miranda* rights. Defendant asked if he was being read these rights because he was under arrest. Officer Avery informed him he was on instructions to arrest Defendant because of his continued trespassing on CHA property. Officer Avery confirmed Defendant was a convicted felon. He then asked Defendant whether the ammunition belonged to him. This was the first time during the entire encounter the issue of the ammunition was raised in front of Defendant. Defendant made no statement about the ammunition before he was *Mirandized*, nor was the ammunition ever discussed in his presence. Defendant immediately admitted the ammunition was his, explaining it was given to him for free and he intended to sell it. Officer Avery then brought Defendant into Leverett's apartment to discuss the ammunition further. Officer Avery eventually informed Defendant he would be confiscating the ammunition because it was illegal for Defendant to possess it.

Under the plurality test, Defendant's statement is admissible. The chief inquiry under the plurality test is "whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Seibert*, 542 U.S. at 611-12. In this case, given the disconnect discussed above, *Miranda* could function effectively. The ammunition was discussed for the first time after Defendant was informed of his rights. Had he asserted his right to remain silent, or requested a lawyer, his refusal to discuss the ammunition would not conflict with any statement he had previously given to law enforcement, nor would it seem to Defendant an exercise in futility, as it may have had the issue already been discussed. Indeed, given the complete

14

disconnect between the two periods of questioning,[6] this case presents, at worst, "a good-faith *Miranda* mistake, not only open to correction by careful warnings before systematic questioning in that particular case, but posing no threat to warn-first practice generally." *Seibert*, 542 U.S. at 615 (citing *Elstad*, 470 U.S. at 309).[7]

Considering the factors identified by the plurality in *Seibert*, the statement's admissibility is clear. With respect to the "completeness and detail involved in the first round of questioning" and the "overlapping content of the statements," the ammunition, as previously noted, was not discussed before *Miranda* warnings were provided. *See Pacheco-Lopez*, 531 F.3d at 428 (holding a statement inadmissible where the post-*Miranda* statement was provided after a question that "was not anomalous, which might support a finding that the warning was effective, but was the next logical question based on the earlier [pre-*Miranda*] statements"). Although the "timing and setting" of the post-*Miranda* statement was similar to the pre-*Miranda* statement, and there was "continuity of the police personnel,"[8] these factors are outweighed by the disconnect between the substance of the questioning. The only discussion of Defendant's trespassing in the post-*Miranda* interrogation came as a result of *Defendant* asking whether he was under arrest. Officer Avery, after answering Defendant's question, focused on the ammunition. In fact, Officer Avery took steps to separate his questions regarding the ammunition from Defendant's trespassing offense. After Defendant asked

---

[6] Defendant, naturally, would dispute the Court's characterization of the questioning as occurring in "two periods," but would contend he was actually subjected to one, continuous round of questioning. The Court refers to two "periods" to distinguish between the pre- and post-*Miranda* questioning and to distinguish the substance of the questioning, which changed markedly.

[7] Again, the Court notes it assumes for the purposes of this motion there was a *Miranda* violation before the warnings were given.

[8] It appears from the video that Officer Avery came outside briefly and discussed the trespassing offense with Defendant before the *Miranda* warnings were provided.

15

if he was going to be arrested, Officer Avery told him he would be arrested for trespassing but cautioned, "but that's trespassing okay?" and before continuing his questioning regarding the ammunition stated, "so moving on beyond that . . . ." The second round of questioning, therefore, was not treated as continuous with the first. Under the plurality test in *Seibert*, Defendant's post-*Miranda* statement is admissible.

The same conclusion must be drawn under Justice Kennedy's test in *Seibert* as well. There is simply no evidence the *Miranda*-in-the-middle interrogation in this case was intentional. The ammunition would have been discussed before Defendant was advised of his rights if police intended to use the technique to obtain a confession. Had that been the case, Defendant's motion may have merit. As it is, however, the evidence suggests nothing intentional on the part of the officers involved in this case. According to Justice Kennedy's test, because the use of the *Miranda*-in-the-middle interrogation was not intentional, the Court must consider whether the original questioning was coercive, and if so, whether the taint of coercion rendered the subsequent statement involuntary.

With respect to the voluntariness of Defendant's statement, the Court must consider the totality of the circumstances and determine whether "the conduct of law enforcement officials is such as to overbear the accused's will to resist." *United States v. Redditt*, 87 F. App'x 440, 443-44 (6th Cir. 2003) (quoting *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994)). The Court must consider whether coercive activity occurred, whether Defendant's state of mind made him susceptible to coercion, and whether Defendant has established causation between the coercive activity and the statement. *Id.*

The only ground on which Defendant objects to his statement is the failure to provide

16

*Miranda* warnings. However, the Court has already concluded the *Miranda* warning provided Defendant was sufficient to guard against the natural coerciveness of custodial interrogation. Moreover, failure to provide a *Miranda* warning, although an element of coercion, is insufficient by itself to establish actual coercion. *United States v. Crowder*, 62 F.3d 782, 788 (6th Cir. 1995) ("As *Elstad* and [*United States v. Sangineto–Miranda*, 859 F.2d 1501 (6th Cir.1988)] demonstrate, however, a Miranda violation by itself cannot require the exclusion of evidence gained as a result of the unwarned statements"). In other words, Defendant has insufficiently alleged *actual* coercion. The law is settled that a defendant must allege some coercive activity before a court will find the confession involuntary. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."); *Cowans v. Bagley*, 639 F.3d 241, 249 (6th Cir. 2011) ("[Defendant] does not allege any government overreaching, which is fatal to his claim of involuntariness.") (citing *Connelly*, 479 U.S. at 169-70). The Magistrate Judge found Defendant's confession was voluntary and Defendant does not explicitly object to that finding. This failure would be sufficient to deny Defendant's motion.

Regardless, the Court finds there is no evidence of coercion here. Defendant is an adult who is familiar with the legal system. The video of his encounter with police demonstrates a relatively cordial interaction without voices raised. There is simply no evidence to suggest his will was overborne by any of the officers' actions. At best, Defendant can point to being detained in handcuffs for nearly thirty minutes, being questioned by multiple officers, and being told he would be arrested for an unrelated charge. Detention in handcuffs, even for lengthy periods of time, is insufficient to establish coercion. *United States v. Sylvester*, 330 F. App'x 545, 548 (6th Cir. 2009)

17

(holding statements were voluntary where the defendant was handcuffed to a bench in a holding cell for nearly five hours); *United States v. Cardenas*, 410 F.3d 287, 295 (5th Cir. 2005) ("Such basic police procedures as restraining a suspect with handcuffs have never been held to constitute sufficient coercion to warrant suppression."). Although the number of officers involved in an interaction with a defendant may be a valid consideration in the coercion inquiry, nothing in this case indicates the officers intimidated Defendant by their number. Indeed, the officers calmly questioned Defendant, and his attitude during the questioning also suggested he was calm. Finally, as the Magistrate Judge noted, a threat of arrest may be coercive, but it is only coercive where the arrest could not be lawfully executed.[9] *See United States v. Sanchez-Diaz*, No. 1:09-cr-56, 2009 WL 3429754, at *5 (E.D. Tenn. Sept. 10, 2009) (citing *United States v. Johnson*, 351 F.3d 254, 263 (6th Cir. 2003); *United States v. Finch*, 998 F.2d 349, 355-56 (6th Cir. 1993)). Because Defendant's statements were not coerced, his post-*Miranda* statement is also admissible under Justice Kennedy's concurrence in *Seibert*.

Although not explicitly raised in Defendant's objections, the Court will also consider whether the government has established a valid waiver of Defendant's *Miranda* rights. As noted above, a waiver must be both voluntary and knowing. For the reasons already stated, the Court finds Defendant's waiver of his *Miranda* rights was voluntary. The government still bears the burden to demonstrate the second prong of the waiver analysis; that is, that the waiver was knowing and intelligent. The government satisfies this burden if it shows the waiver was "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to

---

[9] Before the *Mirandized* questioning, Defendant had been told by Officer Galyon it would be difficult not to arrest him for trespassing due to the number of complaints they had received.

abandon it." *Daoud*, 618 F.3d at 529.

Defendant in this case acknowledged the rights as adequately stated to him by Officer Avery. There is no suggestion Defendant has any disability that casts doubt on his ability to understand such an advisement. When Defendant was read his rights, he immediately inquired whether he was under arrest, which establishes his understanding of the weight and importance of any statement that followed the warnings. Indeed, Officer Avery then advised Defendant he was to be arrested due to his trespassing on CHA property. Given Officer Avery's candid answer, Defendant was on notice of the possibility his statements would be relevant in further proceedings. Further, Defendant's familiarity with the criminal justice system also establishes a likelihood his waiver was knowing and intelligent. *See Redditt*, 87 F. App'x at 445 ("Moreover, Redditt had significant experience with the criminal justice system . . . ."). The government has therefore met its burden to establish a valid waiver by a preponderance of the evidence.

Accordingly, the Court will **DENY** Defendant's motion to suppress his post-*Miranda* statement.

## IV. CONCLUSION

For the foregoing reasons, the Court will **ACCEPT** and **ADOPT** the R&R (Court File No. 34). Defendant's motion to suppress will be **DENIED** (Court File No. 28).

**An Order Shall Enter.**

/s/
**CURTIS L. COLLIER
UNITED STATES DISTRICT JUDGE**

19